In the Matter of the Complaint of BLACK SEA STEAMSHIP COMPANY, Owner of the M/V SVETLOGORSK, for exoneration from or limitation of liability.

Civ. No. 3139.

District Court, Canal Zone, Division Cristobal.

Oct. 22, 1974.

Haight, Gardner, Poor & Havens, New York City, DeCastro & Robles, Balboa, Canal Zone, for plaintiff, Black Sea Steamship Co.

Burke & Parsons, New York City, Roy Phillipps and Henry Newell, Balboa, Canal Zone, for claimant, Cyrus Tanker Corp.

Arias, Fabrega & Fabrega, Gabriel A. Galindo, Panama City, Panama, Crowell, Rouse & Varian, New York City, Albert J. Joyce, Jr., Balboa, Canal Zone, for claimant (Cargo), Administratia Asigurarilor De Stat.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW
### STATEMENT OF THE CASE

CROWE, District Judge.

This is an action arising out of a collision on September 10, 1970 in the Arabian Sea between the Liberian Tanker AQUARIUS and the Russian vessel SVETLOGORSK, carrying general cargo. The plaintiff, Black Sea Steamship Company as owner of the M/V SVETLOGORSK, has petitioned for limitation of liability under the provisions of 9 Stat. 635, 46 U.S.C. §§ 181-189.

On the 10th day of July 1974 a pretrial conference was had and it was decided by the Court after argument of counsel that a separate hearing on the question of limitation of liability be held before and separately from a hearing on the merits. The decision to have a special hearing on the question of limitation of liability was decided upon argument of counsel for AQUARIUS that it could be clearly held separate from a trial on the merits as the question hinged upon the "instructions" given to the SVETLOGORSK'S officers from the Black Sea Steamship Company which restricted or limited their discretion in navigating the vessel. It was argued and decided that such a determination may lead to a settlement and as the proof would be limited with no evidence as to fault or negligence being admitted, expenses may be greatly diminished.

### FINDINGS OF FACT

A pre-trial order was entered on July 19, 1974 wherein the following facts were admitted by the parties:

1. This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure and the jurisdiction of the Court with respect to the parties and the subject matter is conceded by counsel and found by the Court to be present.

2. A statement of the facts material to the case admitted to by all counsel is as follows:

(a) This proceeding arises out of a collision shortly before 4:00 a. m. on September 10, 1970 off the Southeast coast of the Island of Al Masirah in the Arabian Sea between the Liberian Tanker AQUARIUS bound from Kharg Island in the Persian Gulf to Eilat, Israel

and the Russian flag vessel SVETLOGORSK bound on a course of approximately 32°T to Basrah in the Persian Gulf.

(b) The stem of the SVETLOGORSK was in contact with the port side of AQUARIUS on the after side of the bridge structure in the way of the port fuel tank.

(c) Plaintiff, Black Sea Steamship Company, as owner of the M/V SVETLOGORSK, filed its complaint for exoneration from or limitation of liability on or about March 8, 1971 and at the same time filed an interim stipulation for value in the amount of $3,664,666.67 representing the alleged value of the SVETLOGORSK in sound condition in the amount of $3,600,000 less the alleged cost of repairing collision damage in the amount of $145,000 plus pending freight of $209,666.67.

(d) Plaintiff, Black Sea Steamship Company was and still is a company organized and existing under and by virtue of the laws of the Union of Soviet Socialist Republics and at all the material times herein owned and operated the M/V SVETLOGORSK.

(e) Claimant, Cyrus Tanker Corporation (herein "Cyrus") was and still is a corporation duly organized and existing under and by virtue of the laws of the Republic of Liberia and at all the material times herein owned and operated the S/T AQUARIUS.

(f) At the time of the collision AQUARIUS was loaded with a cargo of Iranian Light crude oil and about 211,914 long tons equal to 218,314 metric tons and 1,583,468 U.S. Barrels API at 60° Fahr. which, it is claimed, was owned by Petrol Export Intrepreindere De Stat Pentru Comertul Exterior, a corporation organized and existing under and by virtue of the Socialist Republic of Rumania.

(g) The S/T AQUARIUS is a vessel of 97,450 gross and 214,000 deadweight tons, 1,057 feet long, 158 feet 3 inches in beam, with a molded depth of 82 feet, registered under the flag of the Republic of Liberia.

(h) The M/V SVETLOGORSK is a motor vessel of 9,547 gross tons, launched in 1970, with overall length of 501 feet 4 inches, extreme breadth 67 feet 7 inches, maximum draught 29 feet 7⅛ inches; registered under the flag of the USSR, with the home port of Odessa.

3. In the pre-trial order, claimant Cyrus was permitted to amend its claim to $18,000,000. The claimant, Administratia Asigurarilor De Stat (ADAS), as Rumanian insurers of the cargo on the AQUARIUS has asserted claims of $5,797,147.99 plus interest.

4. The parties agreed, in the order, that plaintiff, Black Sea Steamship Company, had the burden of proving lack of "privity or knowledge" with respect to any fault of the M/V SVETLOGORSK held by the Court to have caused or contributed to the collision. The principal issue to be decided is "whether the navigational orders or recommendations to the officers of the M/V SVETLOGORSK restricted or limited the discretion of the Master and Watch Officers of the SVETLOGORSK from changing course in such a way as to deprive plaintiff of the benefits of limitation of liability".

5. The M/V SVETLOGORSK, immediately prior to commencement on August 6, 1970 of the voyage on which occurred the collision between her and the S/T AQUARIUS on September 10, 1970, was:

(a) Crewed by a sufficient complement of officers and men;

(b) On a watch schedule in which no officer stood more than a four-hour watch in a twelve-hour period;

(c) Equipped with sufficient navigational equipment in satisfactory working order.

6. The Captain and 0000-0400 Watch Officer of the M/V SVETLOGORSK (Chief Officer Iailoyan) navigated the SVETLOGORSK prior to and at the time of collision.

7. These officers were familiar with the International Rules of the Road, and particularly International Rule 16 and the Annex to the International Rules containing Recommendations on the Use of Radar Information as an Aid to Avoiding Collisions at Sea ("Radar Annex").

8. These officers were also familiar with Black Sea Steamship Company's "Recommendations on Application of Electronic Indicator of Situations (EIS) When Sailing in Conditions of Restricted Visibility" dated March 1, 1970, and particularly paragraphs 10, 11, and 12 thereof ("EIS Recommendations").

9. At and prior to the moment of collision the M/V SVETLOGORSK was being navigated with the assistance of EIS in conditions which the SVETLO-GORSK'S Captain and Watch Officer believed to be of restricted visibility (the Court infers no ultimate finding as to actual conditions of visibility at the pertinent times, which issue is to be left to any trial on the merits of the case).

10. Black Sea Steamship Company had ordered the Masters of all its ships that the International Rules of the Road be strictly obeyed.

11. The Captain and Watch Officer considered the International Rules of the Road as the conclusive rules governing the navigation of their vessel.

12. The Captain and Watch Officer interpreted Black Sea Steamship Company's EIS Recommendations as recommendations only, and not as orders, or other mandatory instructions.

13. The Master and Watch Officer interpreted International Rule 16(c) together with paragraphs 1 and 8 of the Radar Annex, and also paragraph 12 of Black Sea Steamship Company's EIS Recommendations, to say that once the SVETLOGORSK and another ship were in danger of collision (a "close quarters situation" under Internacional Rule 16(c), or an entry by another vessel into the SVETLOGORSK'S "zone of dangerous approach" under paragraph 12 of the EIS Recommendations), then the SVETLOGORSK should simultaneously intensify her look out, be ready to carry out immediate avoiding maneuvers and take all way off.

14. The Court finds as a fact that this interpretation of EIS Recommendation 12 and International Rule 16(c) with Radar Annex was reasonable, and was the correct interpretation of both.

15. The Captain and Watch Officer were not restrained by any Black Sea Steamship Company Recommendation from changing the SVETLOGORSK'S course or speed, or both, as required by the International Rules and Radar Annex.

16. The attack of counsel for the AQUARIUS on paragraph 8 of the EIS Recommendations, in final analysis, was that maybe a 2 mile "radius of the zone of dangerous approach", was not a good navigational rule and that a point even closer to the approaching vessel might be acceptable under certain circumstances. This did not diminish the value of the recommendation. The SVETLO-GORSK'S expert of equal prestige testified that it was a good rule and in compliance with the Rules of the Road. The Captain Tutor, her Master and her Chief Mate testified that it was only a recommendation and all the action of the navigating officers were governed by the International Rules of the Road. It is held to be a good rule and only a recommendation.

17. The Recommendations For Using Maneuvering Board etc. (Plaintiff's exhibit 8) were not in use as no manual radar plotting sheets were in use at any pertinent time. The language of the "recommendations" can be used to evaluate the freedom permitted the master, however, and although there are detailed descriptions of the manner of using the maneuvering board and there were monthly training sessions on its use on board the "SVETLOGORSK", the language used was merely hortatory and not mandatory. The International Rules of the Road and the requirements of good seamanship were the factors that governed the master and other officers.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over the parties and the subject matter of this action.

■ 2. In a FRCP Supplemental Rule F limitation of liability proceeding, claimants must prove that their losses were caused by negligence upon the part of the petitioning shipowner, ship or her crew; Holloway Concrete Products Co. v. Beltz-Beatty, Inc., 293 F.2d 474, 476 (5th Cir. 1961); Coleman v. Jahncke Service, Inc., 341 F.2d 956, 958 (5th Cir. 1965); see generally, Gilmore & Black, The Law of Admiralty (1957) § 10–25 and accompanying note (p. 705); 3 Benedict on Admiralty (6 Ed.) § 526 (pp. 559–60).

■ 3. The petitioning shipowner, seeking to limit his liability (if any) to the value of his vessel and her pending freight, must prove that claimants' resulting losses occurred "without the privity or knowledge" of shipowner, in order to sustain his defense; 46 U.S.C. § 183(a); Coryell v. Phipps, 317 U.S. 406, 409, 63 S.Ct. 291, 87 L.Ed. 363 (1943); Coleman, supra; Gilmore & Black and Benedict, supra.

■ 4. Care must be had not to destroy the purpose of the statute which was adopted to encourage shipping and enterprise. Mr. Justice Holmes stated: "We very much appreciate the danger that the act should be cut down from its intended effect by too easy a finding of privity or knowledge on the part of owners, as also by too liberal an attribution to them of contracts as personally theirs". Capitol Transportation Co. v. Cambria Steel Co., 249 U.S. 334, 39 S.Ct. 292, 63 L.Ed. 631. It must be clear therefore that the fault or omission is clearly that of the owner rather than of any member of the crew. In this case even though it were to be held that the "recommendations" were instructions or orders, if they were not followed and negligence was solely that of the crew the owner would be entitled to the benefit of the statute.

■ 5. As regards the standard of proof required of a petitioning shipowner to demonstrate an absence of privity and knowledge, "the ordinary rule of burden of proof—preponderance of the evidence—applies", Waterman Steamship Corporation v. Gay Cottons, 414 F. 2d 724, 738 (9th Cir. 1969).

■ 6. Defendant has not, at this hearing, sustained its position that the Pennsylvania Rule of "showing not merely that her fault might not have been one of the causes or that it probably was not, but that it could not have been", be invoked. The Pennsylvania 19 Wall. (86 U.S.) 125, 22 L.Ed. 148, 1873; The Denali, 105 F.2d 413. This stringent rule is enforced in cases where the vessel at fault was operating in violation of a statute, and this has not been shown. The testimony of the Captain Tutor, Vladislov Marichev, Captain Viktor Kornilov, and Chief Mate, Igor Iailoyan, is to strict compliance with the statutory International Rules of the Road and no other statutory violation is complained of by defendant.

7. The M/V SVETLOGORSK was seaworthy as a matter of law when she broke ground on August 6, 1970, on the voyage during which she collided with the S/T AQUARIUS on September 10, 1970.

■ 8. The Court concludes that paragraphs 10, 11 and 12 of petitioning shipowner Black Sea Steamship Company's "Recommendations of Application of Electronic Indicator of Situations (EIS) When Sailing in Conditions of Restricted Visibility" were not, at this hearing, proven to have contributed to the collision on September 10, 1970 between the M/V SVETLOGORSK and S/T AQUARIUS, in View of the facts that:

a. Paragraphs 10 and 11 permit changes of course and/or speed in situations covered by the first portion of Internationl Rule 16(c) and Radar Annex 4 and 5;

b. Paragraph 12 permits a change of course in an International Rule 16(c) "close quarters situation", and is in accord with Rule 16(c) and Radar Annex (8), in that it recommends preparedness at any moment to change course ("to

carry out anti-collision maneuvers"), as well as intensifying lookout and taking the vessel's way off, in a close quarters situation in restricted visibility; and

c. Paragraphs 10, 11, and 12 are not mandatory, but are expressly designated "recommendations", and were intended by Black Sea Steamship Company and understood by the Captain and Watch Officer of the M/V SVETLOGORSK at the time of the collision to be subject to, and interpreted in accordance with, the International Rules of the Road.

9. The Court concludes that no other Black Sea Steamship Company Recommendations contributed to the collision.

■ 10. It is the risk of collision that prudent mariners should avoid, and in doing so they must have discretion to act and to comply with the International Rules. This basic principle concerning avoidance of the risk of collision is that "a constant bearing is a sure sign of danger, made so by the rules at their very outset; a danger signal which should put every mariner on guard. To be sure, it may not call for an immediate change of course or speed, but it must always be remembered that it is the risk of collision, not the collision itself, that masters must avoid". Ocean Steamship Co. of Savannah v. United States, 38 F.2d 782, 784 (2d Cir. 1930).

11. In United Geophysical Co. v. VELA, 231 F.2d 816, 819 (5th Cir. 1956), Judge Brown stressed the tradition of a Master's being free to exercise his discretion as a prudent navigator, as follows:

"But navigation in these circumstances is left neither to Judges nor the Elder Brethren of Trinity House nor those who, in the garb of experts, from the security of a swivel chair now lay out the course with great conviction. 'The master is the commander of the ship—lord of his little world. He is master in every sense of the word * * *.' The Balsa, 3rd Cir., 10 F.2d 408, 409. Whether he has bridge or quarterdeck to stalk, as long as he commands, he is master. It is the Master, then, who must make these decisions and who, clothed with great responsibility, enjoys the greatest and widest of good faith latitude in professional judgment. 'The fundamental principle in navigating a merchantman, whether in times of peace or of war, is that the commanding officer must be left free to exercise his own judgment. Safe navigation denies the proposition that the judgment and sound discretion of a captain of a vessel must be confined in a mental strait-jacket. * * *' The Lusitania, D.C.S.D.N.Y., 251 F. 715, 728".

12. The trial on the question of limitation of liability, alone, was approached with some misgivings. The rule expressed in vol. 3 Benedict in Admiralty, § 489 on page 381 creates doubt as to the validity of this separate trial.

"Without negligence there can be no privity or knowledge for there is nothing then to which the shipowner, however familiar with facts that establish his innocense, can be said to be privy".

■ Even though the proof is that the master and navigating officers were not operating in a "mental strait jacket" and were free to make decisions in complete compliance with the International Rules of the Road in spite of the "recommendations" of the Black Sea Steamship Company as set out in the plaintiff's exhibits 3 and 8 (Recommendations on EIS etc., and Recommendations for Maneuvering Board etc.) there is ever present the possibility that such recommendations, if followed as prepared, might be a part of the negligence of the plaintiff, if it be established that plaintiff was negligent. Thus if the Black Sea Steamship Company gave "recommendations" that were followed even though, as has been established, its officers were not obligated to follow them and the acts pursuant to the recommendations were found to be negligent, it would follow that the company was a participant in the negligence and would therefore lose its right to limitation.

13. As the case now stands, from the evidence at this hearing, the SVETLOGORSK is entitled to limitation of liability. The EIS (Electronic Indicator of Situations) is a complicated modern radar device and the company would have been negligent if she had not been equipped with instructions concerning the equipment and her officers trained as to its use. The Lady Gwendolen, (1965) 1 Lloyds 335; The "Anonity", (1961) 2 Lloyds 117.

14. The only privity and knowledge established was that the plaintiff's company recommendations were prepared, issued and delivered to the SVETLOGORSK and used on board but it has not been established that these recommendations had any causal connection with the damage occasioned by the collision and this question is left for determination at the hearing on the merits. Plaintiff's liability is limited, as a result of this hearing, to the value of its interest in the M/V SVETLOGORSK and her freight then pending. 9 Stat. 635, 46 U.S.C. §§ 181–189. The hearing on the merits may show that negligence of the plaintiff was the result of following the recommendations and thus divest plaintiff of limitation.